**LUELLEN RY. ARTILLERY, Inc., v. BALDWIN LOCOMOTIVE WORKS.**

Circuit Court of Appeals, Third Circuit.
June 7, 1927.

Rehearing Denied August 23, 1927.

No. 3527.

Patents ☞328—1,244,431, Dawson and Luellen claims 23, 28, 29, 30, 35, 37, and 42, for a system of mobile armament, held not infringed.

Dawson and Luellen patent, No. 1,244,431, claims 23, 28, 29, 30, 35, 37, and 42 for a system of mobile armament, *held* not infringed.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Patent infringement suit by the Luellen Railway Artillery, Incorporated, against the Baldwin Locomotive Works. Decree for defendant (11 F.[2d] 390), and plaintiff appeals. Affirmed.

Theodore S. Kenyon and Lindley M. Garrison, both of New York City, and Clinton W. Frontz, of Philadelphia, Pa., for appellant.

William A. Redding and Worthington Campbell, both of New York City, and Francis B. Bracken, of Philadelphia, Pa., for appellee.

George W. Coles, U. S. Atty., of Philadelphia, Pa., Herman J. Galloway, Asst. Atty. Gen., and Melville D. Church, Sp. Asst. Atty. Gen., for the United States, as amicus curiæ.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. The exhaustive and able opinion of the judge in the court below would warrant this court in adopting it and affirming the decree entered in pursuance thereto; but, in view of the magnitude and importance of the interests here involved, we supplement it with a statement of the results reached by each of the members of this court on independent study thereof.

On November 23, 1915, Luellen and Dawson applied for, and on October 23, 1917, were granted, patent No. 1,244,431, for a system of mobile armament. Their specification stated that "at the present time readily mobile armament for use on land outside of fortifications is limited to small caliber guns," and that "recent developments have shown that guns of long range and large caliber have a decided advantage over great forces with a shorter range armament." Referring to their purpose to improve this situation, their specification states: "It therefore becomes very desirable to quickly mobilize the large caliber, long range guns, in sufficient numbers, to the point of attack or to concealed positions from which they may destroy the enemy." They further stated that heavy armament and mobility could be had with battleships, but that better work could be done on land because of the greater accuracy obtained, due to solid foundations. Referring to these particulars and to dealing with them the specification · says: "The advantage of heavy armament on battleships is that it may be mobilized to any desired point for attack. Land protection is even more essential, and heavy guns can be used with greater accuracy of firing from such foundations."

Referring to the transportation of heavy guns, the specification says: "The condition of the roads, bridges, and general topography of the country make it impractical to move very heavy artillery thereon. The railroad transportation facilities, therefore, must be resorted to. These, however, do not possess at the present any means whereby the large caliber guns may be transported, except in knocked-down condition." Specifying the reasons why heavy guns had not been moved, fired, and withdrawn, and how the inventors purposed effecting a change, the specification says: "The reason for this is the lack of a sufficiently strong foundation under the rails, and the fact that the wheels, rails, and parts of the chassis cannot withstand the shock of firing and the recoil of the gun. Therefore, to make possible the transportation and instant use of large caliber guns, in assembled and ready-to-use condition, it requires an additional means of support; that is, a support supplementing the mobile support. In carrying our invention into practice, we propose to install at fixed and predetermined points, along existing railroads, or at desirable strategic points, where railroad facilities may be installed, suitable foundations, preferably concrete, of sufficient size and stability, from which the heaviest powered guns may be fired and suitable cars upon which the heavy power guns may be mounted, which may be transported to the location of and brought into co-operation with such foundations for firing."

Indeed, that the solid platform, and not the moving to and fro of the gun, was the very essence of the inventors' plan, and that the railroad tracks were a mere incident, is emphasized by the summary at the end of the specification, explaining that they have shown that, while the transportation was made on the tracks of a railroad, this could be dispensed with without affecting the invention, will be seen by this statement: "While we have il-

20 F.(2d)—29

lustrated, and described, one preferable embodiment of our invention, the same is to be considered illustrative, rather than definitive, as changes may be resorted to without departing from the spirit and scope of the invention, as, for instance, we have, in explaining one phase of the invention, described the mobile gun support or carriage as being transportable on the tracks of a railroad to facilitate placing the gun in action upon a stationary or fixed support, it is manifest that, in some instances, it may be found desirable to employ a road vehicle as means of transporting the gun to the stationary supporting foundation, and this comes well within the broad aspect of our invention."

That a solid foundation embedded in the earth was the one and only means in view of the inventors is evidenced by constant references thereto in the specification. Page 2, line 64: "At which points are located fixed foundations or supports for mobile large caliber guns, the use of which is made possible by our invention." Page 2, line 77: "Stationary fixed supporting foundations distributed at desirable points along the railroad." Page 2, line 95: "The car being lowered into position upon the stationary or fixed foundation." Page 2, line 104: "Fig. 10 is a view in side elevation, a part of the car being broken away and the foundation being partially illustrated." Page 3, line 98: "The ties are embedded in the stationary foundation *33*. This foundation is preferably made of concrete, as shown in Fig. 7, and may, if desirable, be of a reinforced character, such as illustrated in Fig. 11, the latter being shown in connection with the support of a mobile carriage adapted to support heavier guns, such as large caliber rifles. In connection with the mobile mortar support or carriage, we embed in the concrete stationary foundation I-beams *34* arranged rectangularly, as illustrated in Fig. 7. These I-beams are partly submerged in the concrete, the upper channels being vacant and free to receive the rectangular framework of the mobile carriage when the latter is lowered into supporting position, as is shown in Fig. 8." Page 4, line 48: "If it is desired to impart additional strength to this stationary foundation, this may be done by embedding U-beams *52* and by anchoring the I-beams by suitable tie rods *53* in the concrete."

Having thus provided solid foundations under the track from which the guns could be accurately aimed, the specification points out the mechanism by which, first, the car carrying the gun could be lowered to such solid foundation; and, second, how it could then by the mechanism be integrally clamped and anchored to such foundation. As to such anchoring to the solid foundation the specification says:

"In order to anchor the carriage when lowered, suitable anchoring means is provided. This may comprise laterally extending bolt brackets *35* arranged along the side beams *25* and transversely along the casting *30*. Cooperating with these bolt brackets are swiveled bolts *36* pivoted to anchorages *37* and arranged to be swung upwardly into position within the apertures or slots of the bolt brackets, suitable retaining and tightening nuts being provided on the bolts. When the carriage is lowered and the bolts are in position, the gun is ready to be fired, as shown in Fig. 8."

It will thus be seen that, when this has been done, the gun chassis has been lowered and clamped to the solid foundation, so as to make, when firing, a unitary structure of the two, and thus secure the accuracy of aim which was the aim of the patentees, in that heavy guns could, as stated by them, "be quickly positioned and more accurately fired from solid foundations than on battleships." Moreover, the specifications contemplated that the practical mobility of the gun and car in going into and out of firing position lay in unbroken maintenance of the mobile elements or wheels of the car, in that regard saying:

"With our invention it will be seen that guns of the heaviest caliber may be transported from place to place, and may be mounted in firing position in such a way that they are adequately supported and the shocks of recoil are fully taken care of, and that at the same time this may be done without removing the guns or gun mounts from the running gear, or displacing the same from the tracks or roadways. In this way the highest degree of mobility is retained at all times, and the guns, while firmly supported during firing, may be almost instantly shifted from one location to another as conditions may require. Thus, no delay is incurred in getting the guns in condition to fire, and, at the same time, in case of the necessity for retreat, the guns can be quickly withdrawn to positions of safety. This is a very important consideration, as it permits the artillery to be used effectually up to the last possible moment without danger of its loss."

It will be noted that this feature of not "removing the guns or gun mounts from the running gear, or displacing the same from the tracks or roadway," was not in the specification as originally filed; but it, as well as claims embodying such limitation, and here in issue, came into the application to avoid cer-

tain patents and publications cited against it. The change was accompanied by an argument differentiating the amended specification from the references, in these words, inter alia:

"The amendment above submitted is directed to that general broad feature of invention disclosed in this application. While the French patent cited illustrated possibly the general thought or conception of a railroad, a portable gun mount, and implacements, there is that lacking feature of prompt transportation. A disassembling of the parts is required in the French suggestion, and the general arrangement is one wherein the entire car body is swung out of position for transportation. By incorporating the term 'fixed implacements' or 'installed implacements,' and by bringing into certain claims the idea of maintaining the car parts in transporting position, the claims clearly differentiate from any suggested prior publication or practice."

Accordingly we find this element of rapid potential transportation, by maintaining the status of a car so as to be capable of transportation use, is found thereafter in all the claims here involved. In claim 23, "co-operating with the lower portion of the car while the same remains in transportable position on the railroad"; in claims 28, 29, and 30, "and to receive and retain the ordnance-carrying car in transportable position"; in claim 35, "anchoring means for the car and ordnance intact, constituting a part of the emplacement, and serving to retain the car and ordance in operative position against recoil"; in claim 37, "means for anchoring the transporting car with its ordnance in firing position on the car"; and claim 42, "to support the gun during firing, while the car is maintained in traveling position on the railway." And not only was this feature of unbroken maintenance of transportation power of the car forced to be brought into the patent, but manifestly the claims were obtained on the representation that this feature differentiated it from other structures which prevented the issue of the broader rejected claims which did not include the limitation of "maintaining the car parts in transporting position" or other similar language. Accordingly, as changed by the amended specification and claims, the invention of Luellen, as evidenced by the change thus made, added to the three elements originally named above, viz.: First, the use of heavy guns; second, accuracy of aim from solid foundation; third, mobility, or the transportation of such guns to and from such foundation—the fourth and new dual element of "not removing the gun or gun mounts from the running gear, or displacing the same from the tracks or roadway."

It is, of course, no reflection on Luellen's patent to say that no mobile equipment was ever made as specified therein for being intended for national use, none would be made, save by the government. Nevertheless the fact remains that no test of it has been made, and in view of the uncontradicted testimony of highly experienced ordnance officers that a pit is necessary for firing large guns at high elevation, we may perhaps question whether a 14-inch gun could be safely mounted and fired on the mechanism disclosed in the specification and drawing of this patent. Be this as it may, we feel it is due Luellen to say that a study of this record has satisfied us that the publicity given to his system was a large factor in spurring the authorities to work in providing mobile armament of large caliber.

Having thus seen the structure proposed by Luellen, we next inquire as to the nature of the defendant's structure which is said to infringe. The defendants place their large gun on a girder which at its front end is carried on a cross-beam seated between two car trucks of six wheels each. At its rear end the girder is similarly placed with relation to the rear trucks of six wheels each. The cross-beam or transom on which the front end of the girder rests is provided with a circular seat, on which the girder can turn and adjust itself to track curves and change of aim. Beneath the railroad track, and at the desired firing point, a pit is dug which is bridged by removable track rails. This pit serves two purposes: First, to allow the breach of the gun to be lowered if higher firing is desired; and, second, provides space for side timbers and steal beams, which run diagonally from a shoulder or buffer reaching above track level at the forward end of the pit, and adapted to receive the recoil of the gun in a manner later shown. The rear ends of these buffer side timbers are seated against cross-timbers placed several feet below in the ground at the rear end of the pit, which receive the thrust, diagonally, of the buffer side timbers. At the front end of the pit is placed a cast iron platform provided with rails for the forward trucks under the girder, and adapted to be raised some four inches above track level by side screws. This movable platform has at its forward end a circular seat adapted to engage a pintle on the under side of the forward end of the girder. When the car reaches the desired position, this platform is raised and the girder adjusted by certain screws, jacks, and mechanism not necessary to here detail, with

the result that the girder at its forward end is carried wholly by the raised platform, by reason of a pintle point on the girder seating itself in the circular seat on the platform. The raising of the platform is guided and aligned by the fact that at its outer ends are wings or extensions adapted to move in a vertical channel way, the rear end of which channel way is the forward end of the diagonal side timber buffer already described. The result of moving the platform is that, when it is raised to the proper point, its side wings are so brought into relation with the forward upper face of the side buffer timbers that the firing recoil is carried from the pintle of the girder to the seat of the platform, where it passes to the platform wings, then to the side buffer timbers, and thence diagonally to the cross-timbers at the bottom and back of the pit, and so to terra firma.

From this it will be seen that in matter of support the two structures are wholly different. Luellen had a solid foundation located under the track, in which the rails were solidly embedded, while the defendant had an open pit provided with removable rails. Luellen's fixed foundation was essential to the proper firing of his gun, while the defendant's open pit was essential to the firing of its gun. The uncontradicted proofs are that a fixed foundation would have prevented, and an open pit was required in order to fire the defendant's guns at high levels. The pit had two functions: First, its construction permitted the entire firing strain to center and be cushioned or vented by the solid earth, several feet below track surface; and, second, the pit allowed the gun the necessary recoil space, when fired at high altitudes.

The purpose of Luellen was what might be called Parthian warfare, namely, to shoot and shift, or, as he expressed it, that their guns, "while firmly supported during fire, may be almost instantly shifted from one location to another as conditions might require." With this in view, he rigidly clamped to the solid foundation the entire car, with all its equipment kept in running order and in position on the rails, thus making an integral, unitary body of car and foundation. The purpose of the defendant was different. When its car was brought over the pit and placed in firing condition, it no longer rested on or was supported by the trucks; it had no connection with rails or trucks, and when placed in firing condition it required the services of some 40 men and upwards of an hour to restore it to a condition where it could be transported. The defendant's structure, while provided with mobile agencies for transporting it to a desired firing point, through its dispensing with, for the time being, means of a rapid getaway after firing, not only wholly lacked the postfiring mobility which was the essence of Luellen's plan, but by the time required to get away from that fixed locality the defendant's structure was subjected to the very thing which Luellen claimed his device effected. For the time being, its fixed location resembled the situation which Luellen described in his patent, namely, "while those in fortifications through the aid of aerial scouts become a fixed and known target to an enemy, who may transport in knocked-down form sufficient armament of a light kind to demolish the fixed fortifications and armament," and the more in its immobility does it resemble the structure which Luellen differentiated, when in the language quoted above he said: "While the French patent cited illustrated possibly the general thought or conception of a railroad, a portable gun mount, and emplacements, there is that lacking feature of prompt transportation."

In these regards the proofs are:

First, that the rails crossing the pit were, and indeed had to be, removed to allow firing. The testimony of Chadwick is:

"Q. Is it absolutely necessary to take up a section of the railroad over the pit? A. Yes, sir; we provided for that by placing the rails in an extended pit on girders that could be unbolted and slid to the side of the foundation. These are the girders (indicating). They move to the side of the foundations for firing. That destroyed the continuity of the railroad track.

"Q. Was it possible to get the breech of the gun down into the pit, if you did not move a section of the rail? A. No, sir.

"Q. Was it possible to replace a section of the rail over the pit while the breech of the gun was in the pit? A. No, sir."

Second, the track rails on the movable platform were and had to be moved above track level, and rail continuity broken, and the girder load had to be taken off both forward and rear trucks. In that regard the evidence of Chadwick is:

"Q. How did you jack up the girder in firing position? A. When we came in firing position, it was necessary to take a load off the trucks, for the simple reason that we had to provide for the azimuth motion of $2\frac{1}{2}$ degrees each side of the center line of the track. That meant we had to get the girder off the truck, bringing the center pins out of the center plates to permit that azimuth motion. We

brought the gun car into firing position, and raised the girder with everything attached to it 4 inches by means of the jacks provided for that purpose.

"Q. Two jacks in the rear? A. Two jacks in the rear end, and two jacks at the forward end."

Third, in Luellen's device the plan was the power and the purpose of getting away at once after firing, when subjected to enemy fire. Defendant's plan and purpose was to remove the ammunition car back and stand fire, because its structure was such that it could not be gotten away quickly, and by its pit was enabled to so elevate its gun that it offered small target surface to the enemy. In these regards we have the testimony of Schuyler, who testified from experience:

"Q. Were you ever under fire of the enemy while you were over there? A. Yes.

"Q. While you were operating? A. Yes.

"Q. While you were operating these railway gun mounts you have spoken of? A. Yes.

"Q. What was your practice when you were under the fire of the enemy in using railway gun mounts? A. We would move the ammunition car, but leave the gun, and then retire for a short distance until the firing had ceased. They would generally fire for perhaps 10 or 15 minutes. We did not believe it practical to get the gun out in any such length of time, and the damage to the gun was very little on the few occasions when shells struck close to it. We thought that it was better to leave the gun this way for a short time, and return to it later, than attempt to remove it under fire. This was a matter in which we had decided from study and consultation with the French, and it was largely because it was not practical to remove the gun instantly, as is possible when a pit is not used. If the mount had been free to move, so that the locomotive could have towed it rapidly away without additional work, we would have done that, instead of elevating the gun.

"Q. You mean that you left the gun in a firing position? A. Yes; we would leave it as it was, taking the ammunition car a short distance up the track.

"Q. And when you left it, was the breech down in the pit of the foundation? A. We used to leave it elevated—had an idea it offered a smaller target."

As to the time necessary to remove defendant's structure he testified:

"Q. How many men did you have to employ for these operations, to bring the gun mount from firing position to transporting position? A. We would keep a whole gun's crew of 40 to 50 busy. There would be jobs for everybody.

"Q. How long did it take you to bring one of these gun mounts from firing position to transporting position? A. We never tried to time ourselves, but it was a job that before everything was finished might take an hour or more."

And as evidencing a purpose to let the gun remain in place, as here noted, it should be observed that the entire car, as shown by the proofs, was protected by armor plate sheeting. We may say that, after the preparation of this opinion, the correctness of our conclusion in this regard was strikingly, but unconsciously, confirmed. A young man who had served in France happened to come into the judges' chambers, and seeing there a model of the battery train gave an interesting account of how, without any knowledge that such a gun was in existence, he was tremendously startled by its discharge, and, going to see where such an unheard-of sound came from, he finally found the battery train so completely camouflaged by the throwing of tree branches over it that it was practically concealed from airplane observers, as, indeed, from him also.

We have not overlooked the fact that the record of the batteries' action in France states that the car was in one case prepared for removal in 25 minutes, but in view of there being five batteries, and but one such time feature recorded, we feel that this was such an unusually short time that it was on that account recorded.

Luellen not only clamped the car with its running gear to the foundation, but he clamped his girder or gun carrier rigidly to the foundation. This he did because, as stated in his patent, by such means his guns were "more accurately fired from solid foundations than on battleships." It will be noted that this rigid clamping to the solid foundation was so important a matter that it was done by Luellen by a series of 22 bolts on each side of the structure, with corresponding front and rear bolts at its ends. By these means absolute girder foundation rigidity was obtained. On the other hand, the front end of defendant's girder rested entirely on a central pivot formed by the pintle, or pin, reaching down from the girder and engaging with the seat on the raised or movable platform. It is thus apparent that the girder of the defendant was held to its position, not by rigidity or fixation to a solid foundation, with strains reaching to each of its four sides, but was held to its position wholly by its own weight, which centered its strain at one central point, namely, the pin-

tle and its seat. This construction allowed for a range of about 2½ degrees or asimuth, as it is technically known.

As showing that the girder was pivotally supported, and why it was functionally so built, the testimony of Chadwick is:

"Q. Did the whole weight of the girder and its parts rest on the transom bedplate when elevated, so as to bring the socket of that plate into engagement with the pintle? A. The weight was supported partially by the transom bedplate and partially by the two jacks at the rear center pin.

"Q. When in that position, was the girder pivotally mounted? A. Yes, sir.

"Q. For what purpose? A. For the purpose of providing a certain amount of train in the gun and bringing it to bear on the target.

"Q. What was the maximum number of degrees on each side? A. Two and a half degrees each side.

"Q. Was that due to the fact that you had this pintle projecting from the bottom and engaging with the socket? A. Yes, sir; that made that azimuth motion."

As we have seen, Luellen's girder was kept, by the solid foundation, from moving during fire, and the firing shock could not vent itself in girder movement; while the fact is, as we have seen, that neither the pit nor the movable platform of the defendant had any restraining effect on the girder, which was anchored in place solely by its own weight, and the statement was made at the argument, without contradiction, that at times when fired the defendant's girder jumped up and out of its seat. As to the fundamental difference between the weight automatic anchoring power of the defendant's ponderous girder structure and Luellen's lighter one, his specification says: "The chassis of the gun or mobile support may be constructed in any suitable manner. We have illustrated, for the purpose, a framework possessing great strength as well as lightness." Necessity required rigid fixation to a solid foundation of Luellen's comparatively light structure to give it stability, while in defendant's structure the proof is "the ordnance weighed 250,000 pounds, and our recollection is that the girder weighed 110,000." It was the difference between the ponderous bulk of the defendant's structure and the greater lightness of Luellen that made the former a structure automatically gravitation-kept in its setting, and necessitated the latter being mechanically bolt-anchored to its solid foundation.

Finding no error in the decree of the court below, it is affirmed.